**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| A.I. CREDIT CONSUMER DISCOUNT CO. | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 04-4049 (WHW) |
| | : | |
| PREMIERE FOODS, INC., FIFTH AVENUE | : | |
| ICE CREAM OF NEVADA, INC., FIFTH | : | |
| AVENUE ICE CREAM, INC., FIFTH | : | |
| AVENUE ICE CREAM OF NEW JERSEY, | : | |
| INC., CONEY ISLAND HOT DOGS OF | : | |
| NEVADA, INC., CONEY ISLAND HOT | : | |
| DOGS, INC., CONEY ISLAND HOT DOGS | : | |
| OF NEW JERSEY, INC., PREMIERE | : | |
| PRETZELS OF NEVADA, INC., and | : | |
| FRANK R. BONANNO, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**Walls, Senior District Judge**

Pursuant to Federal Rule of Civil Procedure 56, Defendant Premiere Foods, Inc.

("Premiere Foods"), Defendants Fifth Avenue Ice Cream of Nevada, Inc., Fifth Avenue Ice

Cream, Inc., Fifth Avenue Ice Cream of New Jersey, Inc., Coney Island Hot Dogs of Nevada,

Inc., Coney Island Hot Dogs, Inc., Coney Island Hot Dogs of New Jersey, Inc., and Premiere

Pretzels of Nevada, Inc. (collectively, the "Affiliate Defendants"), and Defendant Frank R.

Bonanno move for summary judgment on all counts of the Complaint of Plaintiff A.I. Credit

Consumer Discount Co. ("A.I. Credit").  The motion for summary judgment is granted.

NOT FOR PUBLICATION

**FACTS AND PROCEDURAL BACKGROUND**

This action arises as a result of Plaintiff A.I. Credit's inability to satisfy a judgment against Premiere Foods, LLC (the "LLC") and Defendant Premiere Foods in the action titled <u>A.I. Credit Consumer Discount Co. v. Premiere Foods, LLC, et al.</u>, Civ. Action No. 02-2515 (the "First Action"). In the First Action, District Judge Dennis Cavanaugh granted summary judgment in favor of Plaintiff on October 15, 2003, and judgment was entered on January 14, 2004. Once Plaintiff determined that the LLC and Premiere Foods would be unable to satisfy its judgment in the First Action, Plaintiff initiated this action, <u>A.I. Credit Consumer Discount Co. v. Premiere Foods, Inc., et al.</u>, Civ. Action No. 04-4049 (the "Second Action"), on August 20, 2004. In the Second Action, Plaintiff brings claims for (1) piercing the corporate veil, (2) common law fraud, creditor fraud, or fraudulent transfer,[1] and (3) unjust enrichment. On March 23, 2007, Defendants moved for summary judgment, arguing: (1) that Plaintiff is unable to prove every essential element of its various claims; (2) that the unjust enrichment claim is time-barred or, in the alternative, that an unjust enrichment claim is inappropriate when a contract exists defining the scope of the parties' relationship; (3) that res judicata precludes further judgment against Premiere Foods; and (4) that Plaintiff's prayer for attorneys fees is inappropriate. In addition to its opposition brief, Plaintiff filed the declaration and expert report of William P. Breen. The Court heard oral argument on the motion on October 24, 2007.

---

[1] As discussed further below, although Plaintiff's opposition brief to Defendants' motion for summary judgment strongly suggests it is only bringing a claim for fraudulent transfer, its Complaint is devoid of allegations indicating such a claim. In addition, it is unclear whether Plaintiff expressly disclaims any common law fraud or creditor fraud claims. As a result, the Court, for completeness, has analyzed the merits of Plaintiff's claim under each of these fraud-based theories.

NOT FOR PUBLICATION

**1.      The First Action**

Plaintiff filed the First Action on May 24, 2002, as a result of the LLC's default on a loan of $1,037,389.00.  Following the execution of promissory notes and guarantee agreements by the LLC and Premiere Foods, respectively, Plaintiff had forwarded funds to the LLC in two installments – (1) $225,000.00 on June 11, 1996; and (2) $812,389.00 on July 31, 1996.  This loan was intended to finance the purchase of six life insurance policies, which insured the lives of Defendant Bonanno and Frank Bonomo, who, at that time, were the shareholders of Premiere Foods and the Affiliate Defendants.  In addition to the guarantee provided by Premiere Foods, further protection was provided for Plaintiff through an agreement to assign the life insurance policies to serve as collateral securing the loan.

The funds that Plaintiff loaned to the LLC, however, were largely used for purposes other than financing the six life insurance policies.  Between April 1997 and June 2001, only $640,054.00 was disbursed from the LLC in payment of the premiums of the six life insurance policies.  As a result, the six life insurance policies provided Plaintiff with no protection in the event of the LLC's default.

On May 1, 2001, the LLC first defaulted on its obligations.  The LLC did make payment on its obligations for the month of June, but failed to make any further payments due after that date.  Plaintiff declared an Event of Default on February 28, 2002.  Plaintiff filed its Complaint in the First Action on May 24, 2002, and moved for summary judgment on May 15, 2003, which was granted by Judge Cavanaugh on October 15, 2003.  Judgment was entered on January 14,

NOT FOR PUBLICATION

2004, in favor of Plaintiff and against the LLC and Premiere Foods, jointly and severally, in the

amount of $1,231,418.91.

      **2.**      **The Second Action**

      Plaintiff initiated the Second Action on August 20, 2004, following its inability to satisfy

its judgment in the First Action.  Because the LLC had been formed solely to serve as the

borrower in the lending transaction at issue in the First Action, it had no additional funds that

could be used for satisfaction.  Furthermore, in or around May 2003, Premiere Foods, the

guarantor on the loan, ceased active business operations.  Plaintiff alleges that Premiere Foods's

wind-up was a ploy intended to judgment-proof the corporation before a likely adverse judgment

on Plaintiff's motion for summary judgment in the First Action.  In addition to its other two

claims, Plaintiff is now seeking to pierce Premiere Foods's corporate veil to obtain satisfaction of

the First Action from Premiere Foods's sole shareholder – Bonanno[2] – and a number of

corporations with which, under a common organizational structure, Premiere Foods was

affiliated and for which Premiere Foods provided management services – the Affiliate

Defendants.[3]  Plaintiff alleges that Bonanno utilized the corporate form to benefit his own

interests, including the repayment of personal debts and substantial compensation in the form of

"salary."  Additionally, Plaintiff asserts that Premiere Foods's relationship with the Affiliate

---

      [2]  Bonanno and Frank Bonomo had each held fifty-percent interests in Premiere Foods and the Affiliate Defendants, but on March 15, 2002, Bonanno bought out Bonomo's interests.

      [3]  The Affiliate Defendants consist of seven corporations, solely owned by Bonanno.  Each Affiliate Defendant is either (1) the owner of fast food restaurants, or (2) a lease-holding company.

**NOT FOR PUBLICATION**

Defendants was such that no corporate formalities were observed and that there was a lack of financial separation among the organizations.

      **A.**    **Premiere Foods's Relationship to the Affiliate Defendants Before Its Wind-Up**

      Before its wind-up, Premiere Foods had performed management services, including accounting and administrative services, for the Affiliate Defendants.  As part of its management services, Premiere Foods reconciled the bank accounts of the individual fast food restaurants owned by the Affiliate Defendants.  In addition, the day-to-day income of the individual fast food restaurants was typically automatically transferred from their bank accounts to Premiere Foods's bank account, and the funds were used to pay liabilities of the fast food restaurants and to fund the Affiliate Defendants' payroll accounts.  Premiere Foods maintained records as to the source of each deposit into its account, as well as the purpose of each disbursement from its account.  Although there were no written management agreements between Premiere Foods and the Affiliate Defendants, Premiere Foods charged management fees for the services it provided.

      According to Plaintiff, however, Premiere Foods and the Affiliate Defendants acted as an integrated enterprise, with no observation of corporate formalities and no financial separation.  Plaintiff cites testimony from Premiere Foods's Chief Financial Officer Michael Hunt, noting that there was an absence of director or officer meeting notes or records for each, individual Affiliate Defendant.  Further, Hunt states that despite the existence in Premiere Foods's office of corporate books for each of the Affiliate Defendants, the books contained mostly empty pages and some boilerplate information.  Plaintiff asserts that Premiere Foods and the Affiliate Defendants treated income and expenses incurred by individual entities as income and expenses

NOT FOR PUBLICATION

of the organization as a whole. According to Plaintiff, in providing its management services, Premiere Foods often used funds generated by profitable entities to cover losses generated by other entities, but such intra-organizational loans were never reconciled. Plaintiff also alleges that the payment of management fees to Premiere Foods was determined arbitrarily and that the financial statement and tax reporting of the fees would be adjusted among the Affiliate Defendants in whatever manner was deemed in Bonanno and Bonomo's best interests.

        **B.**    **Changes to Defendants' Organizational Structure After Premiere Foods's Wind-Up**

Following Premiere Foods's wind-up in May 2003, Plaintiff alleges that one of the Affiliate Defendants, Fifth Avenue Ice Cream of Nevada, Inc. ("Fifth of Nevada"), assumed all of the services previously performed by Premiere Foods. In 2003, a concentration account and a payroll account were established using the name and taxpayer identification number of Fifth of Nevada, and each of the Affiliate Defendants established its own operating bank account. Beginning in 2003, at the end of each day, the balance of an individual fast food restaurant's bank account is automatically transferred into the operating bank account of the Affiliate Defendant that holds an interest in that restaurant. Following the payment of expenses incurred by the Affiliate Defendant, any money remaining in the operating bank account of the Affiliate Defendant is automatically transferred to the Fifth of Nevada concentration account. Additionally, when an Affiliate Defendant incurs liabilities that are greater than the amount currently in its operating bank account, funds are automatically transferred from the Fifth of Nevada concentration account to the Affiliate Defendant's operating bank account. Fifth of Nevada maintains all records relating to the individual bank accounts of the fast food restaurants,

-6-

**NOT FOR PUBLICATION**

the operating bank accounts of the Affiliate Defendants, the concentration account, and the

payroll account, as well as all records and ledgers for the Affiliate Defendants.

### C.     The General Electric Loans

On September 24, 2003, General Electric Capital Finance Corp. ("GE") entered into

eleven separate loans with the Affiliate Defendants and other related organizations.  Premiere

Foods was not a guarantor for the loans or a recipient of any of the proceeds.  Plaintiff, however,

claims that Premiere Foods and the Affiliate Defendants were acting as one enterprise in the GE

loan transactions and that the GE loans were used to satisfy Bonanno's personal debts.

### LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that [it] is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute between the parties will

not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable

jury could return a verdict for the non-movant and it is material if, under the substantive law, it

would affect the outcome of the suit.  See id. at 248.  The moving party must show that if the

evidentiary material of record was reduced to admissible evidence in court, it would be

insufficient to permit the non-moving party to carry its burden of proof.  See Celotex Corp. v.

Catrett, 477 U.S. 317, 327 (1986).

NOT FOR PUBLICATION

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Fed. R. Civ. P. 56(e); Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. See id. at 255; Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

**DISCUSSION**

**1.     Piercing the Corporate Veil**

Under New Jersey law, all actions seeking to pierce the corporate veil must overcome "the fundamental propositions that a corporation is a separate entity from its shareholders . . . and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." State, Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983) (citations omitted). Accordingly, piercing the corporate veil is "an equitable remedy to be reserved for 'extraordinary circumstances.'" Mitsui O.S.K. Lines v. Cont'l Shipping Line Inc., Civ. Action No. 04-2278, 2007 WL 1959250, at *5 (D.N.J. June 29, 2007). "The purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used

NOT FOR PUBLICATION

to defeat the ends of justice, . . . to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." Ventron, 94 N.J. at 500 (citations omitted).

There are two elements for piercing the corporate veil: (1) "[T]he parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent;" and (2) "[T]he parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." Craig v. Lake Asbestos of Que., Ltd., 843 F.2d 145, 149 (3d Cir. 1988) (applying New Jersey law) (quotation omitted).  According to the Third Circuit, a court should consider the following factors when determining whether the first element, dominance, has been met:

> [G]ross undercapitalization[,] failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

Id. at 150 (quotation omitted).  As this Court has previously stated, with respect to the second element, "there must be some 'wrong' beyond simply a judgment creditor's inability to collect (otherwise, the corporate veil would be pierced in virtually every case)." The Mall at IV Group Props., LLC v. Roberts, Civ. Action No. 02-4692, 2005 WL 3338369, at *3 (D.N.J. Dec. 8, 2005) (citing Sea-Land Servs., Inc. v. The Pepper Source, 941 F.2d 519, 522 (7th Cir. 1991)).  A finding of common law fraud, however, is not necessary for the piercing of a corporate veil; "'injustice or the like' will suffice." Kuibyshevnefteorgsynthez v. Model, Civ. Action No. 93-4919, 1995 WL 66371, at *15 (D.N.J. Feb. 6, 1995) (quoting Allied Corp. v. Frola, 701 F. Supp. 1084, 1088-89 (D.N.J. 1988)).

NOT FOR PUBLICATION

### A. Dominance

In both their supporting and reply briefs, Defendants fail to provide any evidence to challenge Plaintiff A.I. Credit's claims of dominance.  Defendants' arguments on the dominance element boil down to the following:   (1) the "integrated enterprise" test is insufficient, in and of itself, to support the piercing of a corporate veil, (see Defs.' Br. 12-13; Defs.' Reply Br. 6), and (2) the conclusory statement that "Plaintiff alleges no facts that Premiere Foods, Inc. was used or misused by the [Affiliate Defendants]," (Defs.' Reply Br. 6).  By contrast, Plaintiff notes that "[t]he evidence in this case established that no corporate formalities were observed" and that "there was no true financial separation between Premiere Foods and the [Affiliate Defendants]," (Pl.'s Br. 12), supporting those statements with a number of examples in its opposition brief,[4] throughout its counterstatement of material facts,[5] and by virtue of the submission of Mr. Breen's expert report.[6]

---

[4]  Plaintiff alleges that "all money from the enterprise flowed to Premiere Foods," that "all expenses of the corporations (except store employee payroll) were paid by Premiere Foods," and that "Premiere Foods' accountant testified [that] ledger entries were 'adjusted' whenever and in any manner that Bonanno and the accountant deemed appropriate."  (Pl.'s Br. 13.)

[5]  Plaintiff states the following in its counterstatement of material facts: "all monies from the total operations were deposited into accounts of Premiere Foods," but "was not then segregated," (Pl.'s C.M.F. ¶ 74); "if an [Affiliate Defendant's] obligations were paid from cash generated by another [Affiliate Defendant], entries would be made reflecting that the beneficiary corporation had funds 'due to' Premiere and that the corporation whose funds were used had monies 'due from' Premiere," (id. ¶ 77); "[n]o monies . . . were ever actually transferred from Premiere Foods, Inc. to an [Affiliate Defendant] to corroborate . . . 'adjustments' to the Ledger Books" and "[n]o Promissory Notes were ever prepared and executed to reflect these obligations, and no interest was ever charged on monies owed," (id. ¶¶ 79-80); "Hunt [the CFO of Premiere Foods] never saw any directors meetings or officer meeting notes or records of any formal meetings in connection with the operations of any of the corporations," (id. ¶ 88); and "[Hunt] saw corporate books in Premiere Foods' offices . . . . [but] they were mostly 'empty pages' and some 'boilerplate' information," (id.).

[6]  Mr. Breen concluded that "Bonanno controlled and operated Premiere Foods and the [Affiliate Defendants] without regard to their allegedly separate corporate existence, and without observing corporate formalities," that "[p]rior to the fold-up of Premiere Foods, all funds of the integrated enterprise were consolidated in

-10-

NOT FOR PUBLICATION

### B.    Fraud or Injustice

Defendants devote the majority of their briefing on the piercing the corporate veil claim to the fraud or injustice element.  In their supporting brief, Defendants emphasize that "[t]o establish injustice, there must be some 'impropriety'" and note that New Jersey courts typically look to whether "'the corporation was formed or used for some illegal or fraudulent purpose.'" (Defs.' Br. 13-14.)  Defendants argue that "[t]here is no evidence that Premiere Foods, Inc. . . . [was] created as [a] judgment-proof corporation[]" and that "[t]o the contrary, Premiere Foods, Inc. had been in existence and operating as a management company for compensation well before A.I. Credit made the Loan."  (<u>Id.</u> 14.)

Plaintiff counters that Defendants' alleged transfer of assets from Defendant Premiere Foods to Affiliate Defendant Fifth of Nevada during the pendency of the First Action qualifies as injustice for purposes of piercing the corporate veil because the allegedly improper diversion of the income stream rendered Premiere Foods incapable of satisfying the judgment against it. (Pl.'s Br. 14-15 (comparing facts to <u>AYR Composition, Inc. v. Rosenberg</u>, 261 N.J. Super. 495 (App. Div. 1993).)  In addition, Plaintiff argues that "Bonanno breached his fiduciary duty to A.I. Credit by engaging in numerous activities designed to benefit his own, personal interests."  (<u>Id.</u> 16.)

---

the accounts of Premiere Foods," and that "[i]ncome and expenses were moved among the corporations at the whim of Bonanno."  (Breen Report 34.)

NOT FOR PUBLICATION

In their reply, Defendants answer that there was no injustice in this case because Premiere Foods transferred no assets during its wind-up.  (Defs.' Reply Br. 7.)  Defendants also note that Premiere Foods was not a borrower in any of the GE loans.  (Id.)

Superficially, given the suspicious circumstances surrounding Premiere Foods's wind-up, it appears that Plaintiff may have a basis to meet the fraud or injustice element.  It strikes the Court as more than coincidental timing to reallocate a stream of income from a company facing a potential adverse judgment around the time of a summary judgment submission.  Defendants do not address this issue in either their supporting or reply briefs.  In fact, the only explanation for Defendants' actions comes from deposition testimony quoted in Mr. Breen's expert report.  According to Mr. Breen's paraphrasing of Bonanno's deposition, "[t]he business in the Northeast and Florida had been adversely impacted by '9-11[,]' [so] [i]t was decided to shut down under-performing stores and cut expenses."  (Breen Report 17.)  Bonanno testified that "'it didn't make any sense to have . . . another layer of company'" and "'corporations made the decision that they would handle the administration themselves,'" which Mr. Breen points out, that as the sole shareholder, was "just Bonanno at that time."  (Id. (quoting Bonanno Dep. 74).)

In reply, however, Defendants state that Premiere Foods transferred no assets to Fifth of Nevada during its wind-up.  (Defs.' Reply Br. 7.)  If there was no transfer of assets, there can be no calculable damages supporting Plaintiff's piercing the corporate veil claim, regardless of whether Plaintiff may be able to prove liability.  In AYR Composition, which Plaintiff discusses at length in its opposition brief, the New Jersey Appellate Division found that in piercing the corporate veil, the defendants would only be liable for the value of any assets fraudulently

-12-

NOT FOR PUBLICATION

transferred, not the entirety of the corporate debt at issue.  See 261 N.J. Super. at 506-07.  As the

Appellate Division wrote, "[f]or example, if a corporation has $500,000 in debts and the

corporate principals improperly transfer a few thousand dollars worth of corporate property,

representing the final assets of the corporation, it would be highly unfair to charge the principals

with the total corporate indebtedness which may have arisen over many years of corporate

existence when the corporate form was scrupulously followed."  Id. at 506.

        Plaintiff has not provided any evidence to demonstrate the value of Premiere Foods's

assets at the time of wind-up.  When pressed during oral argument by the Court for Premiere

Foods's financial information at any relevant point in time, Plaintiff could not provide the Court

with any evidence that would support the existence of damages.  "[T]he burden of proof is upon

the plaintiff . . . to show the fact and extent of an injury and to show the amount and value of his

or her damages."  22 Am. Jur. 2d Damages § 703 (2007); see also Feurerer v. Adamar of N.J.,

Inc., Civ. Action No. 83-5931, 1985 WL 2781, at *1 (E.D. Pa. Sept. 19, 1985) ("No citation is

necessary for the basic principle of law that plaintiff has the burden of proof as to damages as

well as liability . . . ."); AYR Composition, 261 N.J. Super. at 507 ("Plaintiff has the burden of

proof to demonstrate both defendants' liability and the amount of damages chargeable to

defendants.").  Plaintiff has failed to provide evidence to meet its burden in this instance.

        Because of its failure to provide the Court with any evidence to support the existence of

damages, Plaintiff lacks sufficient evidence to prove the entirety of its piercing the corporate veil

NOT FOR PUBLICATION

claim.  As such Defendants' motion for summary judgment with respect to Plaintiff's piercing

the corporate veil claim is granted.[7]

**2.      Fraud-Based Claims**

**A.      Common Law Fraud or Creditor Fraud**

Plaintiff's Complaint appears to bring a claim for common law fraud or creditor fraud.

(See Compl. ¶¶ 36, 39.)  In its opposition brief, however, Plaintiff appears to abandon any

common law fraud or creditor fraud claim in favor of a fraudulent transfer claim, although its

briefing is ambiguous as to whether it is actually abandoning the common law fraud claim.  (See

Pl.'s Br. 18-23.)  Regardless of Plaintiff's intentions, however, any common law fraud or creditor

fraud claim should be dismissed.

On June 27, 2005, the New Jersey Supreme Court held that an action for "creditor fraud"

does not exist in New Jersey.  See Banco Popular N. Am. v. Gandi, 184 N.J. 161, 175 (2005).  In

addition, an action for common law fraud is improper.  The elements to establish a claim for

common law fraud are as follows: "(1) a material misrepresentation of a presently existing or

---

[7] During oral argument, Plaintiff requested that the Court give it the opportunity to supplement its briefing to remedy its failure to provide the Court with the evidence necessary to support its claim of damages.  On a number of occasions, Plaintiff asserted that Defendants never raised this issue in its briefs, and as a result, the Court should not have anticipated Plaintiff's readiness to provide evidence which would combat the Court's skepticism towards whether Plaintiff would be able to prove damages.  The Court disagrees.

As stated above, a basic evidentiary principle charges a plaintiff with the burden of proof of damages. Plaintiff must have known that at some point it would have been faced with providing the Court with sufficient evidence to make a showing of damages, particularly given that Magistrate Judge Ronald Hedges entered an amended final pre-trial order on March 29, 2007, suggesting a trial date in the near future if this summary judgment motion had been denied.  Further, however, despite what Plaintiff stated during oral argument, the Court believes that Plaintiff should have been aware of the issue of damages solely on the basis of the briefing of this motion. Although stated tersely, Defendants' reply brief does assert that Premiere Foods transferred no assets during its wind-up.  (Defs.' Reply Br. 7.)  Moreover, as discussed below, Plaintiff's entire fraudulent transfer claim revolves around the issue of whether Premiere Foods, in fact, transferred assets during its wind-up.  The Court does not consider it wise policy to allow a plaintiff to overlook necessary elements of its claim solely because deficiencies were not explicitly brought to its attention.

-14-

NOT FOR PUBLICATION

past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other

person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."

Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997) (citation omitted).  With respect to

Defendants' actions surrounding Premiere Foods's wind-up in 2003, Plaintiff is unable to prove

any of the elements for common law fraud.  Defendants' motion for summary judgment with

respect to any claims for creditor fraud or common law fraud is granted.

### B.   Fraudulent Transfer[8]

The Uniform Fraudulent Transfer Act governs all claims for fraudulent transfers in New

Jersey.  See N.J. Stat. Ann. §§ 25:2-21 - 2-34 (1997).   According to § 25:2-25:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether
> the creditor's claim arose before or after the transfer was made or the obligation was
> incurred, if the debtor made the transfer or incurred the obligation:
> > a.  With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> > b.  Without receiving a reasonably equivalent value in exchange for the transfer or
> > obligation, and the debtor:
> > > (1)  Was engaged or was about to engage in a business or a transaction for
> > > which the remaining assets of the debtor were unreasonably small in
> > > relation to the business or transaction; or

---

[8]  Defendants correctly point out that Plaintiff has not pled a claim for fraudulent transfer.  (Defs.' Br. 5.)
The only allegations in the Complaint that remotely indicate a fraud-based claim are as follows:  (1) "Bonanno,
through Premiere Foods and the [Affiliate Defendants], is utilizing the corporate structure of Premiere to obtain an
unjust result and to perpetrate a fraud upon creditors, including A.I. Credit," (Compl. ¶ 36); and (2) "The actions of
Bonanno, Premiere Foods and the [Affiliate Defendants] constitute intentional fraud and were intended to and did in
fact cause A.I. Credit to sustain substantial monetary damages . . . ," (id. ¶ 39).
   As stated above, there is no action for creditor fraud in New Jersey.  See Gandi, 184 N.J. at 175.  Plaintiff
filed its Complaint on August 20, 2004, nearly a year before Gandi, but Defendants' motion for summary judgment
was filed March 23, 2007, more than one and a half years after Gandi, giving Plaintiff ample time to amend its
Complaint.  Apparently, Defendants learned of Plaintiff's intent to assert a claim for fraudulent transfer in Plaintiff's
Answers to Interrogatories, filed on July 21, 2005.  Although the Court believes that it would be sufficient to grant
Defendants' motion for summary judgment with respect to Plaintiff's "claim" for fraudulent transfer solely based on
that it was not pled in Plaintiff's Complaint, it will consider Plaintiff's arguments in favor of fraudulent transfer.  See
Aldinger v. Spectrum Control, Inc., 207 Fed. Appx. 177, 180 n.1, 181 (3d Cir. 2006) (affirming district court's
dismissal of claim that was not pled in complaint and was first raised in summary judgment opposition brief ).

NOT FOR PUBLICATION

(2)  Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

For there to be a fraudulent transfer, however, there must be a "transfer."  The statute defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  § 25:2-22.  An "asset" is "property of a debtor," § 25:2-21," and "property" is "anything that may be the subject of ownership," § 25:2-22.

Defendants argue that there was no transfer of an asset.  (See Defs.' Br. 5-7; Defs.' Reply Br. 2-5.)  In their supporting brief, Defendants assert that the only support that Plaintiff has for its fraudulent transfer claim is Mr. Breen's expert report, wherein Mr. Breen states that "[w]hen Premiere Foods was closed down, the assets and liabilities of Premiere Foods were transferred to [Fifth of Nevada]."  (Breen Report 30, ¶ 4.)  Defendants, however, state that Mr. Breen's examples to support his opinion only "relate to the liabilities of Premiere Foods, Inc., not the assets."  (Defs.' Br. 7.)

In its opposition brief, Plaintiff argues that three specific assets of Premiere Foods were fraudulently transferred: (1) "the income stream of administrative fees;" (2) "[v]aluable tax deductions;" and (3) "the creditworthiness of the integrated enterprise."  (Pl.'s Br. 19.)  The first two alleged assets were transferred to Fifth of Nevada, while the third alleged asset was "diverted through the G.E. [loans], to the benefit of Bonanno individually, and not for the benefit of arms-length creditors of Premiere Foods, such as A.I. Credit."  (Id.)

NOT FOR PUBLICATION

In their reply, Defendants contend that "where the management agreements are not in writing, [management agreements] are deemed to **not** constitute assets as a matter of law " and that "Premiere Foods, Inc. was not a party to [the GE loans]," so "there was no conveyance, as a matter of law." (Defs.' Reply Br. 4.)

Defendants are correct that any allegation that "the creditworthiness of the integrated enterprise" was fraudulently transferred is misplaced. Section 25:2-25 begins with the following: "A transfer made or obligation incurred by a <u>debtor</u> is fraudulent as to a creditor . . . ." (emphasis added). The definition of debtor is "a person who is liable on a claim," § 25:2-21, which in this case is Premiere Foods, as guarantor. Because, as Plaintiff states in its counterstatement of material facts, "Premiere Foods was not a guarantor for the [GE] loan[s] nor was it a recipient of any of the proceeds of the loan[s]," (Pl.'s C.M.F. ¶ 124), Premiere Foods could not have made a transfer or incurred an obligation with respect to the GE loans. The statute is clear as to the status of the parties to which it applies; Plaintiff's allegations of an "integrated enterprise" are simply insufficient to find liability based on a theory of fraudulent transfer.

Whether summary judgment should be granted, dismissing the entirety of Plaintiff's potential claim for fraudulent transfer, revolves around the issue of whether "the income stream of administrative fees" and "valuable tax deductions" are assets for purposes of New Jersey's version of the Uniform Fraudulent Transfer Act. Although the New Jersey Supreme Court has made no pronouncement with respect to this issue, Defendants point to <u>Karo Marketing Corp. v. Playdrome America</u>, 331 N.J. Super. 430 (App. Div. 2000), <u>abrogated, on other grounds, by Gandi</u>, 184 N.J. at 175, which is instructive.

-17-

NOT FOR PUBLICATION

In <u>Karo</u> a management company had oral contracts with a number of operating companies that were part of the same organizational structure, whereby it received a management fee for determining marketing strategy and overall policy for the companies.  <u>See</u> 331 N.J. Super. at 436. The management company owed money for services rendered by the plaintiff, and the plaintiff alleged that immediately preceding a negative judgment in an earlier case brought by the plaintiff against the management company, the management company became judgment-proof as it "was effectively stripped of its only real asset – the income source from its contract or contracts with the operating companies." <u>Id.</u> at 434-35, 440.  The management activities were transferred to a new company that was created solely to overtake the prior management company's activities. <u>See id.</u> at 435.  The New Jersey Appellate Division affirmed the trial court's ruling that there was no fraudulent transfer because no asset of value was transferred.  <u>See id.</u> at 437-38, 444.  The trial court found that the management company had "few significant assets and its only source of income was an oral contract or contracts with the operating companies which contracts were terminable at will." <u>Id.</u> at 437.  The court concluded that "the . . . contract had no value and therefore was not an asset of value." <u>Id.</u> at 438; <u>see also</u> <u>In re LiTenda Mortgage Corp.</u>, 246 B.R. 185, 190-94 (Bankr. N.J. 2000) (holding that Trustee failed to state cause of action under Uniform Fraudulent Transfer Act because there was no transfer, where defendant terminated servicing agreement with plaintiff pursuant to terms of contract, denying plaintiff proceeds of servicing agreement which was its primary source of income).

According to the Complaint, "[a]t all relevant times Premiere was paid a service fee by the [Affiliate Defendants], which fee was determined on an *ad hoc* basis by Bonanno and

NOT FOR PUBLICATION

Bonomo and which was not set forth in any writing nor set by any predetermined agreement or formula." (Compl. ¶ 30(f).)[9]  Given the alleged "ad hoc" nature of Premiere Foods's relationship with the Affiliate Defendants, "the income stream of administrative fees" cannot be found to be a fraudulently transferred asset.  Premiere Foods did not transfer anything to Fifth of Nevada when it allegedly assumed Premiere Foods's management activities; rather, the Affiliate Defendants simply took their business elsewhere.

As for the "valuable tax deductions," those, too, were not fraudulently transferred assets. Because Plaintiff does not provide any explanation in its opposition brief as to how these tax deductions are assets, it is necessary to infer from Mr. Breen's expert report when and how Premiere Foods allegedly transferred these tax deductions.  According to Mr. Breen, a number of bookkeeping entries resulted in Bonanno's ability to take a tax deduction that allowed him to pay no taxes on $5,146,178.00 that he had received as distributions from Fifth of Nevada.  (Breen Report 28-29, ¶ 1.)  Essentially, Premiere Foods reclassified $6,785,644.88 owed to the Affiliate Defendants as being owed to Fifth of Nevada as an "Accounts Payable."  (Id.)  Fifth of Nevada recorded those funds as an "Accounts Receivable" and then recorded as a liability the funds that it now owed to the Affiliate Defendants.  (Id.)  Premiere Foods wrote off the Accounts Payable to Fifth of Nevada and recorded a debt forgiveness of the same amount as miscellaneous income. (Id.)  Fifth of Nevada wrote off the Accounts Receivable from Premiere Foods as uncollectible,

---

[9]  In addition, Plaintiff's counterstatement of material facts states that "there weren't any written agreements between the [Affiliate Defendants] and Premiere regarding the administrative fees," (Pl.'s C.M.F. ¶ 70), and paraphrases CFO Hunt's deposition testimony, stating that "the partnership agreements stipulated that 'a management company that was selected by the general partner' . . . would receive a management fee, and Premiere performed that function for all of the partnerships because 'the general partner had the right to select whatever management company they (sic) decided,'" (id. ¶ 66).

**NOT FOR PUBLICATION**

recording a bad debt expense of $6,785,644.88.  (Id.)  The resulting loss was passed to

Bonanno's personal tax return due to Fifth of Nevada's status as an 1120 S-Corporation.  (Id.)

Although Bonanno certainly received a benefit as a result of his ability to take the tax

deduction, no asset was transferred by Premiere Foods to Fifth of Nevada.  All that was

transferred was liability of $6,785,644.88.

Because no assets were transferred during Premiere Foods's wind-up, Defendants'

motion for summary judgment is granted with respect to any potential claim for fraudulent

transfer.

> **3.      Unjust Enrichment**

To establish a claim of unjust enrichment, "a plaintiff must show both that defendant

received a benefit and that retention of that benefit without payment would be unjust."  VRG

Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994) (citations omitted).  "The unjust

enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant

at the time it performed or conferred a benefit on defendant and that the failure of remuneration

enriched defendant beyond its contractual rights."  Id. (citations omitted).

In their supporting brief, Defendants provide two arguments in favor of dismissal of

Plaintiff's claim for unjust enrichment: (1) the six-year statute of limitation governing unjust

enrichment actions has expired, (Defs.' Br. 16-17); and (2) given the existence of the loan

documentation between A.I. Credit, Premiere Foods, and the LLC, an action for unjust

enrichment is barred, (id. 17-18).  Notably, throughout their supporting brief, Defendants assume

**NOT FOR PUBLICATION**

the bases of Plaintiff's unjust enrichment claim are the events of June and July 1996 – i.e., the forwarding of loan proceeds.

Plaintiff, however, counters that "the cause of action for unjust enrichment arises from Bonanno's actions relating to the wind-up of the affairs of [Premiere Foods] in 2003, and not from the 1996 loan agreement with A.I. Credit." (Pl.'s Br. 25.)[10]  Repeating its arguments supporting its claims for piercing the corporate veil and fraudulent transfer, Plaintiff states that "Bonanno had a duty to A.I. Credit to preserve Premiere Foods' assets for the satisfaction of its creditors" and that "Bonanno also had a duty not to cause the fraudulent transfer of assets of Premiere Foods," concluding that "Bonanno breached these duties, and has received substantial benefits, at the expense of A.I. Credit." (Id.)

To the extent that Plaintiff believes a cause of action for unjust enrichment arises from Defendants' activities in the wind-up of Premiere Foods in 2003, it is mistaken.  An unjust enrichment claim requires a showing not only that a defendant received a benefit, but that the benefit was received from a plaintiff.  Defendants did not receive any benefit from Plaintiff in 2003; the sole benefit received from Plaintiff was in June and July 1996, when the funds were forwarded.

Given that the benefit from Plaintiff was received, at the latest, on July 31, 1996, any claim for unjust enrichment is time-barred.  New Jersey has adopted a six-year statute of limitation for non-personal injury actions involving monetary damages, a grouping which

---

[10] Defendants' confusion as to the basis of Plaintiff's claim is completely reasonable as the Complaint states only that "Bonanno and the [Affiliate Defendants] have been unjustly enriched at the expense of A.I. Credit as a result of their wrongful actions, including, without limitation, the receipt by Bonanno of a multi-million dollar life insurance policy for his personal benefit." (Compl. ¶ 41.)

NOT FOR PUBLICATION

includes unjust enrichment actions.  N.J. Stat. Ann. § 2A:14-1 (2000); see Baer v. Chase, 392

F.3d 609, 621-22 (3d Cir. 2004).  The cause of action accrues during the "last rendition of

services," as "[t]he essence of a quasi-contract claim is not the expectancy of the parties, but

rather the unjust enrichment of one of them."  Baer, 392 F.3d at 622-23.  The last rendition of

services in this case was on July 31, 1996, the date that Defendants received the last of the funds,

over eight years from the filing of this action.  Defendants' motion for summary judgment

regarding Plaintiff's claim of unjust enrichment is granted.[11]

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted.


November 5, 2007                                    s/William H. Walls
                                                    United States Senior District Judge



**Appearances**

Kathleen Cavanaugh
Jerome F. Gallagher, Jr.
Norris McLaughlin & Marcus, P.A.
P.O. Box 1018
Somerville, NJ 08876
                    Attorneys for Plaintiff

Karen A. Ermel
Karen A. Ermel, L.L.C.
7 West Main Street
Mendham, NJ 07945
                    Attorney for Defendants

---

[11]  Defendants' additional argument with respect to unjust enrichment (i.e., that the action is barred due to the existence of the original loan documentation), as well as its res judicata and attorneys fees arguments are moot, given the Court's other rulings on this summary judgment motion.

-22-